**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

RALPH HODGES,                                    CASE NO.: 1:10-cv-884

            Plaintiff,                                    Judge Michael R. Barrett

      v.

CITY OF MILFORD, et al.,

            Defendants.

**OPINION AND ORDER**

      This matter is before the Court on the Motion for Summary Judgment of
Defendants City of Milford, City of Milford Police Department and Chief Mark Machan
(collectively, "Defendants").  (Doc. 22).  Plaintiff Ralph Hodges ("Plaintiff") has filed his
opposition (Doc. 40), and Defendants have filed their reply (Doc. 41).  This matter is
now ripe for review.

**I.      BACKGROUND**

      The facts are construed in favor of Plaintiff as follows.

**A.      Employment History**

      Plaintiff was born on August 25, 1959.  (Doc. 24 at 344).[1]  He enlisted in the
United Air Force and remained there until receiving an honorable discharge in
November 1978.  (Doc. 40 at 1509; Doc. 40-2 at 1571).  He began his law enforcement
career as a corrections officer for Clermont County's Sheriff's Office on or about July 6,
1993.  (Doc. 24 at 346).  In 1996, he began to work as an auxiliary officer for the City of

---

[1] All document citations are the Court's docket number, and the page numbers provided reference the
PageID number provided by the Court's electronic filing system.

Milford and later became a part-time patrol officer.  (Doc. 24 at 346-47).  On or about August 24, 1998, Plaintiff began working as a full-time patrolman for the City of Milford.  (Doc. 24 at 346, 348).  He remained in that position until January 17, 2011.  (Doc. 24 at 348-49).  His employment with the City of Milford ended because he "had decided to take a retirement through the Ohio Police and Fire Pension Board" that was offered after he initiated the application process for disability retirement.  (Doc. 24 at 349, 352).

Plaintiff did not have an individual employment contract with the City of Milford.  (Doc. 24 at 348).  Instead, his employment with the City of Milford was governed by the collective bargaining agreement ("CBA") that existed between the City of Milford and the Fraternal Order of Police, Ohio Labor Council, Inc.  (Doc. 24 at 348).  That CBA contained a grievance procedure that was to be used when a bargaining unit employee alleged that there had been a "breach, misinterpretation, or improper application of the Agreement."  (Doc. 22-1 at 107).

B.     **Vacant Sergeant's Position and Sergeant's Examination**

In February 2005, the City of Milford hired a new Chief of Police, Defendant Mark Machan ("Machan").  (Doc. 23 at 235).  Prior to Machan being hired, the Chief's position had been filled on an interim basis by Dan McDonald.  (*See* Doc. 40-1 at 1527-1534)  When Machan took over as Chief, McDonald provided Machan with a multi-page analysis of the Milford Police Force that included a rundown on the various officers.  (Doc. 40-1 at 1527-1534). That analysis specifically includes a brief commentary on Plaintiff, which provided, in part:  "THIS officer is your cross to bear and he always seems to be on the edge.  He will challenge at every opportunity.  Do as you wish, I would be poised to move him out at the first available opportunity."  (Doc. 40-1 at 1529).

2

In 2008, Machan indicated in the City of Milford Police Department's annual report that he would be taking steps to fill the sergeant position that became vacant with the 2007 retirement of Sergeant Ray Butler. (Doc. 40-2 at 1561). In March 2008, Machan met with Milford's Personnel Commission to start the hiring process for the vacant sergeant's position. (Doc. 40-1 at 1540). Machan explained that he would use an "assessment center process" to "fill the vacant sergeant's position," and the "scoring would be based on a point system" where the "assessors will not know the candidates taking the exam" except by number. (Doc. 40-1 at 1540). Machan stated that he would get back to the commission with a date for the sergeant's examination. (Doc. 40-1 at 1540). According to Secretary Sue Ruhoff, there was no discussion at that meeting as to whether the City could afford to pay for the sergeant's position. (Doc. 25 at 435-36). She testified that she did not believe Machan would have asked for the sergeant's position if he did not believe he had the money to pay for it. (Doc. 25 at 435-36).

The next time that the sergeant's examination was discussed with the Personnel Commission was on November 13, 2008. (Doc. 40-1 at 1542-43). At that meeting, it was reported that the sergeant's examination would be conducted at an assessment center on November 22, 2008 and that an announcement of the examination was sent to all of the Milford officers. (Doc. 40-1 at 1542-43). There was no mention of whether there would be sufficient funds to pay for the sergeant's position. (Doc. 40-1 at 1542-43).

The sergeant's examination was held on or about November 22, 2008 and was conducted by three chiefs of police from neighboring jurisdictions. (Doc. 40-2 at 1549-57). Six officers, including Plaintiff, competed for the position. (Doc. 40-2 at 1571). A

3

"Final Report" of the Milford Police Sergeant's Assessment is dated November 24, 2008. (Doc. 40-2 at 1549). In that report, Plaintiff, as candidate "F," is shown as having scored 276 total points. (Doc. 40-2 at 1557; Doc. 24 at 394). With that point total, Plaintiff tied for third place on the sergeant's examination. (Doc. 40-2 at 1557). That total did not include any employment credits or veteran's preference points. (*See* Doc. 40-2 at 1557).

On or about December 4, 2008, an email was sent to Machan that contained the sergeant test results. (Doc. 40-1 at 1548). On December 22, 2008, Machan sent an email to the six candidates for the sergeant's position stating:

> I know that you are very anxious about finding out have [sic] you have done. I spoke with the Chief from Loveland who is working on the final report. He is just about complete and will have it to personnel commission soon. Once he give [sic] the report to the commission and I receive it[,] I will add the pre-assessment points. I will keep you updated the best I can.

(Doc. 40-2 at 1558).

Another "Final Report" of the Milford Police Sergeant's Assessment is dated January 14, 2009. (Doc. 40-2 at 1562). In that report, Plaintiff, as candidate "F," was again shown as having scored 276 total points, which meant he placed third on the sergeant's examination. (Doc. 40-2 at 1570; Doc. 24 at 394). Again, that total did not include any employment credits or veteran's preference points. (Doc. 40-2 at 1570; Doc. 24 at 394). On that same date, an email was sent to Sue Ruhoff with that final report. (Doc. 40-1 at 1545).

On January 15, 2009, Machan sent out an email that indicated he could not have the Milford Police Department not be in compliance with the Milford Codified Ordinance relating to parking regulations. (Doc. 40-1 at 1546). He later noted on January 21,

4

2009 that "the only employee that was affected was Officer Hodges." (Doc. 40-1 at 1546).

On February 12, 2009, Sue Ruhoff forwarded the test results to City Manager Loretta Rokey and Machan, indicating that she also had received "your e-mail today with the names that are associated with the 'letters' on the results." (Doc, 40-1 at 1544). She requested to send the results to the Commission members for acceptance of the report. (Doc. 40-1 at 1544).

During the first part of 2009, Plaintiff verbally asked Machan about the status of the examination and was consistently told that the results would be posted as soon as Machan received them. (Doc. 24 at 389). Having not received the results, Plaintiff sent an email to Machan on July 27, 2009 in which he requested to see his test scores from the sergeant's examination given in November 2008. (Doc. 40-1 at 1547). He indicated that if Machan did not have them, then he wanted the name and number of the person that did have them. (Doc. 40-1 at 1547).

The first time Plaintiff saw the Final Report was in or about October 2009. (Doc. 24 at 392-93). On that report, Plaintiff was identified as a candidate "F," and based upon the results contained in that report, Plaintiff did not score the highest on the sergeant's examination. (Doc. 24 at 393-95). Machan testified that although he received the assessment score from the 2008 sergeant's examination that indicated Plaintiff did not finish first among the candidates, he never tallied the final scores for that examination. (Doc. 23 at 281-82). During litigation, however, Plaintiff received a document showing that when given a 10% credit for his service as a veteran as well as other employment credits, he scored 330 points. (Doc. 40-2 at 1571). Having received

5

330 points, Plaintiff had scored the highest on the sergeant's examination. (Doc. 40-2 at 1571).

Plaintiff was never promoted to sergeant during his tenure with the City of Milford. In fact, the vacant sergeant's position was never filled by the City of Milford until 2011 based upon the results of a sergeant's examination given in 2011 after Plaintiff had resigned from the City of Milford. (Doc. 25 at 456). Like all sergeants' promotions since 2003, the officer that was promoted to the sergeant's position in 2011 was under the age of 40. (Doc. 40-2 at 1575). If Ralph had been promoted to sergeant, then his salary would have increased by $6,955 per year. (Doc. 40-2 at 1574).

### C.   The City of Milford's Budget

For the 2008 fiscal year, the City of Milford had a budget deficit. (Doc. 27 at 637). For the first three months of 2009, the City of Milford ran on a temporary budget. In March 2009, Defendants finalized their budget for 2009 with approval from City Council. (Doc. 22-3 at 187-212). Based on that finalized budget, the City of Milford projected a deficit of $493,744 in the general fund for the 2009 fiscal year. (Doc. 22-2 at 187-212). However, Secretary Sue Ruhoff testified that she did not recall any discussion about budget problems and not being able to fill the sergeant's position in 2009 because of those problems. (Doc. 25 at 451-52).

Based on the numbers from 2009, the revenues actually exceeded expenses by approximately $1.5 million. (Doc. 27 at 646). The City also had money available that it could use on additional expenditures, such as the sergeant's position. (Doc. 27 at 649).

In February 2011, after this lawsuit was filed, the City Manager, Loretta Rokey, made a note that the sergeant's position had not been filled in 2008 due to budgetary constraints. (Doc. 25 at 517).

### D. Hodges' Work-Related Injury

The City of Milford had a policy regarding work-related injuries that was in place as of November 2, 2004. (Doc. 40-1 at 1539). The policy states:

> Prior to return to work from personal or work-related injuries, a return to work physical is required. If Bethesda Eastgate has not provided initial care and a release for full duty, all injured Police Officers should be scheduled for an evaluation with Dr. Randolph . . . .

(Doc. 40-1 at 1539).

In 2004, Plaintiff injured his knee in the line of duty and filed a worker's compensation claim. (Doc. 40-2 at 1575). As a result of that injury, Plaintiff lost some strength in his knee. (Doc. 40-2 at 1575). He subsequently had operations on his knee in 2004, 2008 and 2009. (Doc. 40-2 at 1575).

Later in 2009, Plaintiff attempted to obtain a permanent partial settlement from the Bureau of Worker's Compensation because of his knee. (Doc. 40-2 at 1575). In connection with his request for settlement, the worker's compensation commission had him see Dr. Ortega who wrote a report to the commission. (Doc. 37-1 at 1238). The August 31, 2009 report stated:

> Mr. Hodges is a 50-year old police officer who was injured in the line of duty on December 10, 2000. He was trying to subdue a mental patient. He was treated medically with non-steroidal medications and physical therapy[.]
>
> He underwent an arthroscopic chondroplasty and debridement with lateral release in July 2004. Post-operatively, he continued to have aching discomfort in his knee with instability[.] He was given Synvisc injections without any benefit[.] A repeat MRI in February 2008 revealed a torn medical meniscus[.]

7

On February 2, 2009, he underwent left knee arthroscopic partial medial meniscectomy and phca removal and chondroplasty.

He has not regained the strength of the knee and has fallen in his face because of it.  He takes Arthrotec and Vicodin.

(Doc. 37-1 at 1238).

On September 25, 2009, Machan placed Plaintiff on medical leave due to the August 31, 2009 letter from Dr. Ortega.  (Doc. 40-2 at 1575; Doc. 37-1 at 1240).  Machan referred Plaintiff to Dr. Randolph for evaluation.  (Doc. 37-1 at 1241).  As a result, Plaintiff saw his treating orthopedic surgeon, Dr. Lawley who had performed the previous operations on Plaintiff's knee.  (Doc. 40-2 at 1575; Doc. 37-1 at 1243).  Dr. Lawley evaluated Plaintiff has being fit to return to duty.  (Doc. 40-2 at 1575).

On or about October 22, 2009, Plaintiff was examined by a third orthopedic surgeon, Dr. Frank Noyse, who cleared Plaintiff to return to work at "full duty."  (Doc. 40-2 at 1576; Doc. 37-1 at 1242).  Plaintiff thus returned to work on October 23, 2009.  (Doc. 40-2 at 1576).

Officer Steve Bogan, who was under 40 years of age, also experienced a medical issue.  (Doc. 23 at 313-14).  Officer Bogan was a part-time patrol officer for the City of Milford Police Department and a full-time corrections officer for the Sheriff's Department.  (Doc. 27 at 313-14).  At the time he experienced the medical issue, Officer Bogan was placed on medical leave.  (Doc. 23 at 313-14).  To return from medical leave, Officer Bogan did not go through the same procedures as Plaintiff.  (Doc. 23 at 313-14) (Q:  And [Officer Bogan] came back to work?  A:  Correct.  Q:  Did he go through the same paces that Ralph went through?  A:  No.  Q: He didn't?  A: No.").  Instead, Machan called the Sheriff's Office and obtained verbal confirmation that Officer Bogan had been cleared to return to work as a corrections officer by the doctor for the

8

Sheriff's Office. (Doc. 23 at 313-15). Officer Bogan was not required to obtain clearance from Dr. Randolph, the doctor for the City of Milford's Police Department. (Doc. 23 at 315).

In December 2009, Plaintiff sent a letter to the city Attorney Michael Minniear requesting a meeting to discuss his grievances concerning his treatment by Machan and Rokey. (Doc. 40-2 at 1572). Minnear told Plaintiff that he had to speak to Rokey and Machan. (Doc. 40-2 at 1576).

## II. <u>ANALYSIS</u>

Plaintiff has filed a Complaint and an Amended Complaint in which he asserts claims for (1) age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*, (2) age discrimination in violation of Ohio Revised Code § 4112.13, (3) retaliation in violation of Title VII and Ohio Revised Code § 4112, (4) violation of his civil rights under the First Amendment and the Fourteenth Amendment's Equal Protection Clause pursuant to 42 U.S.C. § 1983, (5) breach of contract, (6) tortious interference with contract, (7) violation of his rights under Article I, Section I of the Ohio Constitution, (8) discrimination against a veteran in violation of 38 U.S.C. § 4311, and (9) retaliation against a veteran. (Doc. 1; Doc. 10). Defendants have moved for summary judgment on Plaintiff's claims. (Doc. 40).

### A. <u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" only if its resolution affects the outcome of the suit.  *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment.  *Anderson*, 477 U.S. at 248-49.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

### B. Age Discrimination Claims

Plaintiff's Counts I and II contain claims based on age discrimination under the ADEA and Ohio law, respectively.  (Doc. 1 at 4-6)  The Ohio Supreme Court has held that federal caselaw interpreting the ADEA is equally applicable to age discrimination claims brought under Ohio law.  *Williams v. General Elec. Co.*, 269 F. Supp. 2d 958, 966 (S.D. Ohio 2003) (citing *City of Columbus Civ. Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 697 N.E.2d 204, 206-07 (1996); *Cochran v. Columbia Gas of Ohio, Inc.*, 138

Ohio App. 3d 888, 742 N.E.2d 734, 738 (Ohio App. 2000)). Therefore, the following summary judgment analysis applies to both the ADEA and Ohio age discrimination claims. *See id.*

Based on the briefings of the parties, it appears that Plaintiff is attempting to establish age discrimination based on (1) disparate treatment, and (2) hostile work environment. The Court will consider both claims below.

### 1. **Disparate Treatment**

The ADEA prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). *Accord:* O.R.C. § 4112.02. "The burden of persuasion is on the plaintiff to show that 'age was the "but-for" cause of the employer's adverse action.'" *Blizzard v. Marion Tech. College*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)). "A plaintiff 'may establish a violation of the ADEA by either direct or circumstantial evidence.'" *Id.* (quoting *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009)). Where the plaintiff fails to present direct evidence of age discrimination, the claim is analyzed using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Id.*

Here, Plaintiff does not argue that he has direct evidence of age discrimination nor does he present any evidence that would demonstrate that such direct evidence exists. As such, the Court analyzes his age discrimination claims for disparate treatment under the *McDonnell Douglas* burden-shifting framework.

Under *McDonnell Douglas*, a plaintiff has the burden of proving a *prima facie* case of discrimination.  In order to establish a *prima facie* case of age discrimination using circumstantial evidence under the *McDonnell Douglas* framework, a plaintiff must show that: "(1) he is a member of the protected class, that is, he is at least forty years of age; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was treated differently from similarly situated employees outside the protected class." *Mitchell v. Vanderbilt Univ,*, 389 F.3d 177, 181 (6th Cir. 2004).  If a *prima facie* case can be shown, then the burden shifts to the defendant to prove a legitimate, nondiscriminatory basis for the termination.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  If the defendant carries this burden, then the plaintiff must show that the legitimate, nondiscriminatory basis is, in fact, only a pretext to hide the discrimination.  *Blizzard*, 698 F.3d at 283 (citing *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003)).

It is undisputed that Plaintiff has met his burden at this stage of the litigation as to the first and third elements of his *prima facie* case.  (*See* Doc. 22 at 78).  Instead, the parties dispute whether Plaintiff has met his burden as to the second and fourth elements of his *prima facie* case, and as to whether Defendants' proffered legitimate non-discriminatory reason for their actions was pretextual.  (Doc. 22 at 78-83; Doc. 40 at 1516-24).   The Court will address each of those disputed issues below.

### a)  Adverse action

The Sixth Circuit defines an adverse employment action as a "materially adverse change in the terms or conditions of her employment." *Kocsis v. Multi-Care Mgmt., Inc.*,

97 F.3d 876, 885 (6th Cir. 1996). Examples of adverse employment actions include hiring, firing, failing to promote, reassignment with significantly different responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575-76 (6th Cir. 2004). A plaintiff also may establish an adverse employment action by demonstrating that he or she was constructively discharged. *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001). A constructive discharge exists when "'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Kocsis v. Multi-Care Mgmt., In*c., 97 F.3d 876, 887 (6th Cir.1996) (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). To demonstrate a constructive discharge, a plaintiff must adduce evidence to show that (1) "'the employer ... deliberately created intolerable working conditions, as perceived by a reasonable person,'" and (2) "the employer did so 'with the intention of forcing the employee to quit . . . .'" *Logan*, 259 F.3d at 568-69 (quoting *Moore v. Kuka Welding Systems & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). Intent can be shown by demonstrating that resigning was a foreseeable consequence of the employer's actions. *Moore*, 171 F.3d at 1080. The Sixth Circuit has adopted a number of factors that a court should consider for purposes of satisfying the first prong of the constructive discharge inquiry:

> "Whether a reasonable person would have felt compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7)

13

offers of early retirement or continued employment on terms less favorable than the employee's former status."

*Logan*, 259 F.3d at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

Nevertheless, employment actions that are *de minimis* are not actionable. *Kocsis*, 97 F.3d at 886. The change in employment terms or conditions must be "'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)).

Defendants argue that Plaintiff was not subject to an "adverse employment action" because he intentionally sought disability retirement in both 2008 and 2010. (Doc. 22 at 78; Doc. 41 at 1580). Although Plaintiff does not in his opposition make any direct statement regarding the adverse action he alleges to have experienced, his Complaint (Doc. 1) and opposition (Doc. 40) suggest an intent to argue that he was subject to the adverse employment actions of failure to promote, a change in parking conditions, being put on medical leave for several weeks, not being permitted to return to work until he underwent multiple fitness for duty evaluations, and/or constructive discharge. As such, the Court will consider each below.

*Failure to Promote*

As stated above, a failure to promote qualifies as an adverse employment action. *Burlington,* 524 U.S. at 761. Plaintiff has set forth evidence to support his allegation that he was not promoted to the position of sergeant during his tenure with Defendants even though he applied for and was qualified for the position. (*See* Doc. 40-2 at 1549-57, 1562-1571). Plaintiff also has set forth evidence that he would have earned

14

approximately $6,955.00 more as a sergeant. (Doc. 40-2 at 1574). Construing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has met his burden at this stage of the litigation of showing that he was subject to the adverse employment action of failure to promote.

### Parking Conditions

As to his second purported adverse action, being subjected to a change in parking conditions is a *de minimis* change in conditions that is not actionable. *Kocsis*, 97 F.3d at 886; *Hollins*, 188 F.3d at 662. As such, Plaintiff has not met his burden as to this purported adverse action.

### Involuntary Medical Leave

As to Plaintiff's third purported adverse action, Plaintiff contends it consisted of him being involuntarily placed on medical leave. He, however, does not specifically argue that there was any material change in his employment conditions as a result of being placed on medical leave. Nevertheless, construing in favor of Plaintiff the documentary evidence to which he cites that contains statements suggesting Plaintiff may have lost compensatory, sick or vacation time, and may have been placed on unpaid leave for a period of time (Doc. 40 at 1521-22) (citing Doc. 37-1 at 1241, 1243), the Court finds that Plaintiff has satisfied his burden at this stage of the litigation to set forth evidence from which the Court may infer that Plaintiff suffered an adverse action when he was placed on medical leave.

### Fitness for Duty Evaluations

Plaintiff's fourth purported adverse action is that he was required to undergo multiple fitness for duty evaluations and obtain multiple medical clearances before he

could return to work. Although Plaintiff does not argue that he actually lost benefits by being put on medical leave or that he suffered any further change in conditions by having to undergo the multiple fitness for duty evaluations, the documentary evidence to which Plaintiff cites again indicates that being precluded from returning to work for a period of time while undergoing multiple fitness for duty evaluations may have caused a material change in benefits such as the loss of pay or the loss of compensatory, sick or vacation time. (Doc. 40 at 1521-22) (citing Doc. 37-1 at 1241, 1243). As such, Plaintiff has satisfied his burden at this stage of the litigation of setting forth evidence from which the Court may infer that he suffered an adverse action when he was required to undergo multiple fitness for duty evaluations.

*Constructive Discharge*

The Court now turns to Plaintiff's fifth purported adverse action – constructive discharge. Assuming Plaintiff's arguments and evidence to be true, the circumstances upon which his constructive discharge claim would be based would be that (1) Machan had been advised by the interim chief to "move [Plaintiff] out at the first available opportunity" (Doc. 40-1 at 1529); (2) Plaintiff would have scored the highest on the sergeant's exam if the scores were tallied, but he was never promoted to sergeant during his tenure (Doc. 40-2 at 1549-57, 1562-1571); (3) Plaintiff was the only employee affected by an instruction from Machan to park trucks in the municipal parking lot (Doc. 40-1 at 1546; Doc. 40-2, 1576), (4) Machan made Plaintiff jump through hoops to get medical evaluations and releases that were not required of other younger employees. (Doc. 37-1 at 1238, 1240-43; Doc. 40-2 at 1575-76), and (5) Plaintiff requested and was offered a retirement pension from the Ohio Police and Fire Pension Board, which he

16

accepted (Doc. 22-1 at 95; Doc. 24 at 349, 52). However, Plaintiff does not contend or set forth any evidence that demonstrates he was ever demoted, had a reduction in job responsibilities, was reassigned to menial or degrading work, was reassigned to work under a younger supervisor, or had been made offers of retirement or continued employment on terms less favorable than his former status. (*See generally* Doc. 40).

Although there is evidence that may suggest that Defendants desired Plaintiff to quit or retire, the Court does not find the evidence sufficient to show that Defendants deliberately created objectively intolerable working conditions that would compel a reasonable employee to quit or retire. Although Plaintiff was not promoted, neither was anyone else while Plaintiff was employed with Defendants. *See Johnston v. O'Neill*, 130 Fed. App'x 1, 6, 9 (6th Cir. 2005) (finding plaintiff failed to prove constructive discharge on summary judgment based on evidence he did not receive a promotion and was subject to an investigation because a reasonable person would not have felt compelled to retire under those circumstances). As to the parking incident, it was, as explained above, a mere inconvenience that cannot be found to create an intolerable working condition that would compel an employee to quit. As for Plaintiff being required to undertake several more steps to obtain medical clearance in one instance, that action – although alone may constitute an adverse action – does not itself create working conditions that would compel an employee to quit or retire. Indeed, Plaintiff makes no allegations or arguments that he felt compelled to retire because of the working conditions or because he felt that he was being forced to retire. Rather, the evidence before the Court demonstrates, and Plaintiff does not contend otherwise, that Plaintiff

voluntarily chose to seek out disability retirement and had done so one other time before any of the above incidents occurred. (Doc. 22-1 at 95; Doc. 24 at 349, 52).

*Summary*

For the foregoing reasons, the Court finds that Plaintiff has satisfied the second element of his *prima facie* case for the purposes of summary judgment only as to the purported adverse actions of failure to promote, being placed involuntarily on medical leave and being precluded from returning to work from medical leave until undergoing multiple fitness for duty evaluations.

### b) Similarly situated, non-protected employees treated more favorably

Given the above conclusion on the second element of the *prima facie* case, the Court must consider whether similarly situated, non-protected employees were treated more favorably than Plaintiff with respect to promotions, being placed on medical leave, and being permitted to return to work from medical leave. To establish that an employee is an appropriate comparator, "the plaintiff [must] demonstrate that he or she is similarly situated to the [claimed comparator] in all relevant respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998).

*Failure to Promote*

The Court will start with the failure to promote adverse action. To prove the fourth element of the *prima facie* case in a failure to promote case, the plaintiff must show that other similarly situated, non-protected employees received promotions at the time the plaintiff's request for promotion was denied. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *see also Brewer v. Cedar Lake Lodge, Inc.*, 243 Fed. App'x 980, 987 (6th Cir. 2007) (recognizing that the proper standard to apply in a failure

18

to promote case was the standard articulated in *Nguyen*).  Plaintiff has failed to set forth any evidence to satisfy this fourth element of the *prima facie* case.  Plaintiff has not demonstrated that any employee, much less a similarly situated, non-protected employee, received the promotion to sergeant at the time that plaintiff was denied the promotion.  Rather, the evidence before the Court demonstrates that the results from the 2008 sergeant examination taken by Plaintiff were valid for twelve months.  (Doc. 25 at 456).  During the twelve months in which those results were valid, no employee was promoted to that sergeant position, and instead, that position remained vacant until 2011.  (Doc. 25 at 456; *see also* Doc. 40-2 at 1575).  Further, the evidence shows that Plaintiff did not apply for the promotion in the year he claims that a similarly-situated, non-protected employee was promoted, as he already had retired at the time that promotion occurred in 2011.  (Doc. 25 at 456; Doc. 24 at 349, 352).  *See also Ross v. Mich. State Univ. Bd. of Trs.*, No. 11-2278, 2012 U.S. App. LEXIS 17338, at *3-4 (6th Cir. June 20, 2012) (in a race discrimination case, the plaintiff failed to prove the fourth element of *prima facie* case based on failure to promote where he did not show that any similarly situated employee was promoted at the time he was denied); *Gibson v. Shelly Materials, Inc.*, No. 2:07-cv-377, 2009 U.S. Dist. LEXIS 28853, at *20-24 (S.D. Ohio Mar. 30, 2009) (same).

*Involuntary Medical Leave*

Similarly, Plaintiff has not satisfied the fourth element of his *prima facie* case as to the purported adverse action of being placed involuntarily on medical leave.  Although Plaintiff attempts to compare himself with Officer Bogan, that comparison is unavailing.  There is no evidence that Defendants ever received any information after

Officer Bogan returned to work indicating that Officer Bogan had a physical problem post-surgery that affected his ability to perform his duties.  In contrast, Defendants had the letter from Dr. Ortega that indicated that Plaintiff "had not regained the strength of the knee and he has fallen in [sic] his face because of it."  (Doc. 37-1 at 1238).  Moreover, when Defendants were aware that Officer Bogan had a medical issue, he, like Plaintiff, was placed off duty for a period of time.  (Doc. 23 at 313-14).  As such, Plaintiff has not set forth any evidence that would demonstrate that a similarly situated employee in a non-protected class was treated more favorably with respect to being placed on medical leave, and therefore, he has not met his burden as to the fourth prong of his *prima facie* case on that issue.

*Fitness for Duty Evaluations*

However, Plaintiff has met his burden of proving the fourth prong of his *prima facie* case as to the adverse action of being precluded from returning to work prior to receiving multiple fitness for duty evaluations.   For this purported adverse action, Plaintiff compares himself to Officer Bogan.  Officer Bogan was a part-time officer of the City of Milford's Police Department who was under 40 years of age, and thus, served in a role similar to Plaintiff.  (Doc. 23 at 313-14).  There is no evidence presented to the Court that Officer Bogan was subject to different policies or procedures than Plaintiff with respect to medical issues experienced while employed by the City of Milford's Police Department.  Nevertheless, when Officer Bogan sought to return to work from medical leave, he was not required to go through the same procedures as Plaintiff. (Doc. 23 at 313-14) (Q: And [Officer Bogan] came back to work?  A: Correct.  Q: Did he go through the same paces that Ralph went through?  A: No.  Q: He didn't?  A: No.").

20

Instead, Machan called the Sheriff's Office and obtained verbal confirmation that Officer Bogan had been cleared to return to work as a corrections officer by the doctor for the Sheriff's Office.   (Doc. 23 at 313-15).   Officer Bogan was not required to obtain clearance from Dr. Randolph, the doctor for the City of Milford's Police Department. (Doc. 23 at 315).  In contrast, Plaintiff visited three doctors before he was permitted to return to work at the City of Milford's Police Department.  (*See* Doc. 37-1 at 1241-43; Doc. 40-2 at 1575-76).   Therefore, when the evidence is viewed in the light most favorable to Plaintiff, it suggests that Officer Bogan was a similarly situated, non-protected employee who was treated more favorably than Plaintiff with respect to his ability to return to work following medical leave.

*Summary*

In sum, the Court finds that Plaintiff has failed to create a genuine issue of material fact as to his *prima facie* case of disparate treatment under the ADEA and Ohio law with respect to the adverse actions of failure to promote and being placed on medical leave.   Summary judgment therefore is granted to Defendants on Plaintiff's disparate treatment claim in Counts One and Two as to those adverse actions. However, it further finds that Plaintiff has raised a genuine issue of material fact as to his *prima facie* case of disparate treatment under Counts One and Two with respect to his ability to return to work following medical leave.  The Court therefore will consider below only whether Plaintiff has proved pretext as to his ability to return to work following medical leave.

### c)  <u>Legitimate, Non-Discriminatory Reason and Pretext</u>

Once Defendants have articulated a legitimate, non-discriminatory reason for its actions, it is Plaintiff's burden to prove pretext. "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (emphasis in original). Unsupported speculation cannot form the basis for demonstrating pretext. *See Sutherland*, 344 F.3d at 623.

The Sixth Circuit has explained that in proving pretext the plaintiff must set forth more than a dispute over the facts upon which her discharge was based. *Braithwaite v. Timken Co.,* 258 F.3d 488, 493-94 (6th Cir. 2001). Instead, the plaintiff must put forth evidence which demonstrates that the employer did not "honestly believe" in the proffered non-discriminatory reason for its adverse employment action. *Id.* at 494. In order to determine whether the employer had an "honest belief," it is necessary to consider whether the employer can establish its "reasonable reliance" on the particularized facts that were before it at the time the decision was made. *Id.* In *Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998), the Sixth Circuit noted that:

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.

This Court must not second guess the business judgment of the employer, but simply evaluate "whether the employer gave an honest explanation of its behavior." *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (internal quotations and citations omitted). There are three interrelated way in which the plaintiff may prove pretext: (1)

by showing that the proffered reasons had no basis in fact, (2) by showing that the proffered reasons did not actually motivate the employer's action, or (3) by showing that the proffered reasons were insufficient to motivate the employer's action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (citing *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012); *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).  The ultimate burden of persuading the trier of fact that the employer intentionally discriminated against her remains at all times with the plaintiff. *Burdine*, 450 U.S. at 253.

Here, Defendants have not addressed whether they have a legitimate, non-discriminatory reason for why Officer Bogan was not subject to the same standards, and was subject to less stringent standards, for returning to work from medical leave than Plaintiff.  Absent such a legitimate, non-discriminatory reason for its actions, the Court cannot find that summary judgment is appropriate.

Moreover, even if Defendants had articulated a legitimate, non-discriminatory reason, the Court finds that Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether its actions were pretextual. A satisfactory showing that similarly situated employees, who do not belong to the protected class, were treated differently with regard to a work rule can lend support to a plaintiff's pretext argument.  *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000) (plaintiff can prove pretext under the third *Manzer* prong by demonstrating that he was treated differently than similarly situated employees).  Here, the evidence put forth by Plaintiff suggests, when construed in the light most favorable to him, that the circumstances were insufficient to warrant the adverse action.  Plaintiff has set forth evidence that

suggests he visited three doctors, and obtained clearance from at least two of them, before he was permitted to return to work.  (Doc. 37-1 at 1238, 1240-43; Doc. 40-2 at 1575-76).   On the other hand, Officer Bogan, an officer under the age of 40, was permitted to return to work after Machan was verbally told by Officer Bogan's full-time employer that he had received a medical clearance to return to work.  (Doc. 23 at 313-15).  Based on the differing treatment, the Court concludes that summary judgment is not appropriate as to Plaintiff's claims for disparate treatment under Counts One and Two as they relate to Plaintiff's treatment with respect to returning to work after medical leave, and the case shall proceed on those claims.

## 2.   Hostile Work Environment

To state a claim for hostile work environment claim, a plaintiff must establish four elements:  "1. The employee is 40 years old or older; 2. The employee was subjected to harassment, either through words or actions, based on age; 3.  The harassment had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile, or offensive work environment; and 4.  There exists . . some basis for liability on the part of the employer."  *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-35 (6th Cir. 1996). Whether an environment is hostile or abusive is determined by looking at all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). "Both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person

24

would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000).

Here, Plaintiff contends that he was subject to a hostile work environment because Machan "attempt[ed] to place him on medical leave in September, 2009 and forb[ade] him to park his truck in the Municipal parking lot." (Doc. 40 at 1518-19). He sets forth no evidence that there were any age-based comments made to him in relation to, or in addition to, those two incidents. Rather, his theory is that because he was over 40 years of age and was the only employee subject to those actions, the conduct must have been based on his age.

Even assuming that those two incidents were "based on age" as they must be to state an actionable claim for a hostile work environment, they are insufficient to meet the minimum threshold for a hostile work environment. *See Hale v. ABF Freight Sys.*, No.11-6440, 2012 U.S. App. LEXIS 22283, at *42 (6th Cir. Oct. 25, 2012) (affirming summary judgment to employer after finding that the workplace criticisms to which the plaintiff was subject certainly may have been frustrating and discouraging, but that "'they were part of the ordinary tribulations of the workplace' that do not amount to the sort of 'extreme' conduct required to effect a 'change in the terms and conditions of employment'") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 662 (1998)). The two incidents at issue here were isolated and do not amount to the sort of severe or pervasive conduct, either individually or collectively, that the ADEA intends to remedy. The parking incident, although possibly resulting in frustration and inconvenience, is a minor slight or workplace tribulation that does not rise to the level of severe or pervasive conduct. As for the medical leave incident, that

25

incident occurred only after Machan received a letter from a doctor indicating that Plaintiff may not have fully recovered from an injury. While Plaintiff may speculate that the medical leave was unfairly imposed upon him, his speculation is not evidence, and the evidence shows that any unfairness in the conduct was not particularly severe or abusive as the conduct was supported by a doctor's letter, was not different from treatment received by younger officers, and was not accompanied by any physical threats or other humiliation. Further, to the extent that Plaintiff intends to rely in support of his hostile work environment claim upon evidence of having to undergo three medical examinations while a younger counterpart had to undergo only one for which he did not have to produce documentation, that conduct, while possibly inconsistent, is not the type of "extreme" conduct that is intended to be protected by a hostile work environment claim. *See Malloy v. Potter*, 266 Fed. App'x 424, 428 (6th Cir. 2008) (age related comments stemming from continued absences and poor work performance along with contradictory work orders from management were insufficient to satisfy the threshold for an objectively hostile work environment claim under the ADEA); *Plautz v. Potter*, 156 Fed. App'x 812, 820 (6th Cir. 2005) (criticism of the plaintiff by supervisors as a result of work performance was not sufficiently severe to permeate the workplace culture so as to create a hostile work environment). Finally, and relatedly, Plaintiff has not produced any evidence tending to show that the conduct interfered with or impeded his work performance and/or created an objectively intimidating, hostile, or offensive work environment, within the meaning of *Harris*.

The Court notes that Plaintiff does not contend that his lack of promotion is a basis for his hostile work environment claim. However, even if he intended to rely upon

it, that conduct would not save his hostile work environment claim.  The Sixth Circuit has explained that instances of non-selection or examples of the plaintiff being denied promotional opportunities do not, without more extreme conduct, create a hostile work environment.  *Ferguson v. Snow*, 185 Fed. App'x 456 (6th Cir. 2006).  Here, aside from not being promoted, Plaintiff has set forth no evidence as to any overtly age-based comments relating to the failure to promote.  Even when that denial of a promotional opportunity is considered in conjunction with the incidents described above, the evidence still is insufficient to show an objectively hostile work environment that permeated Plaintiff's work environment.  Just because Plaintiff experienced several workplace incidents that were unfavorable to him does not mean that the conduct was severe or that the work environment rose to the level of being hostile and abusive.  *See, e.g.*, *Scola v. Publix Super Mkts., Inc.*, No. 1:11-CV-101, 2012 U.S. Dist. LEXIS 145312, at *31 (E.D. Tenn. Oct. 9, 2012) (although plaintiff cited five incidents where she was referred to as "old lady" and her failure to receive a promotion, she did not meet her burden of proving her work environment was hostile and abusive); *Lenzley v. D & B Corp.*, No. 2:05-CV-00469, 2007 U.S. Dist. LEXIS 23146, at *35-36 (S.D. Ohio  Mar. 29, 2007) (the plaintiff failed to meet the burden of showing conduct was "severe and pervasive" where her evidence showed only that he was not included in calls and meetings and he was placed on a Performance Improvement Plan).  Moreover, the Court again notes that Plaintiff has not produced any evidence tending to show that the conduct interfered with or impeded his work performance.

Accordingly, the Court concludes that Plaintiff has not met his burden of demonstrating a genuine issue of material fact as to whether a hostile work environment

existed.    Summary  judgment  is  granted  to  Defendants  on  Plaintiff's  hostile  work environment claim.

### B.    Retaliation

In Count Three, Plaintiff brings a claim for retaliation under Title VII and Ohio Revised Code § 4112.01, *et seq.*   (Doc. 1 at 6-7).   While it is unclear to the Court whether Plaintiff actually intends to bring his retaliation claim pursuant to Title VII or instead intends to bring it pursuant to the ADEA, Defendants have not specifically addressed that issue in their motion for summary judgment and rather have assumed the claim for retaliation was based on age discrimination.   As such, the Court will not address that issue here.   Nevertheless, the Court notes that the retaliation standard is virtually identical in either instance. *See Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (standard for retaliation claim under Title VII); *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010) (standard for retaliation claim under ADEA and Title VII).

Retaliation claims based on circumstantial evidence also follow the *McDonnell Douglas* burden-shifting analysis. *Spengler*, 615 F.3d at 491.   Under this framework, "Plaintiff has the initial burden to establish a prima facie case of retaliation . . . by establishing that: (1) he engaged in protected activity when he made his age discrimination complaint; (2) Defendant knew about his exercise of the protected activity; (3) Defendant thereafter took adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.* at 491-92 (citing *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007)); *Abbott*, 348 F.3d at 542.   If a *prima facie* case is established, then the

burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *See Tuttle v. Metro. Gov't of Nashville and Davidson Cnty.*, 474 F.3d 307, 320 (6th Cir. 2007). The final burden rests on the plaintiff who must prove that the proffered non-discriminatory reason was merely pretext for actual retaliation. *Id.*

As with Plaintiff's claims for disparate treatment under the ADEA and Ohio law, Defendants seek to dismiss Plaintiff's retaliation claim on the basis that he has not alleged an adverse action and has not proved prexext.[2] As explained above with respect to Plaintiff's claim for disparate treatment, the only adverse actions for which Plaintiff has established a genuine issue of material fact are promotion to sergeant, being placed involuntarily on medical leave, and being required to undergo multiple fitness for duty evaluations prior to returning to work from medical leave. Therefore, the only other issue to decide based upon Defendants' motion is whether Plaintiff has created a genuine issue of material fact on the issue of pretext as to those adverse actions. The same standard that applies for proving pretext with respect to the disparate treatment claims above (*see supra*, pp. 21-22) also applies with respect to the retaliation claims.

*Failure to Promote*

Here, the Court first will address the failure to promote. Defendants contend that their legitimate, non-discriminatory reason for failing to promote Plaintiff was that the City of Milford had economic issues and had projected a budgetary shortfall for 2009. Plaintiff appears to attempt to prove pretext by showing either that Defendants' proffered reason lacked a basis in fact or did not actually motivate the adverse action. Construing

---

[2] Defendants make no argument as to elements (1), (2) or (4) of the retaliation claim, and do not explain for the Court what the relevant protected activity is in this case. As such, the Court does not address any of those issues in this Opinion and Order.

the evidence in the light most favorable to Plaintiff, he has met his burden at this stage of the litigation of proving pretext as to Defendants' failure to promote him to sergeant.

The evidence suggests that Defendants changed their explanation during the course of the litigation as to why Plaintiff was not promoted to the sergeant's position. Initially, the explanation was that Plaintiff did not finish first on the sergeant's examination; however, when the evidence showed that Plaintiff actually did finish first on the sergeant's examination, Defendants shifted their focus to the explanation that the City of Milford did not fill the position because of budgetary constraints.  As the Sixth Circuit has recognized, an employer's shifting explanations may constitute evidence of pretext. *Cichewicz v. Unova Indus. Automotive Systems, Inc.*, No. 02-1831, 92 Fed. App'x 215, 220 (6th Cir. 2004) (explaining that evidence tending to demonstrate the falsity and inconsistency of the employer's explanations for the plaintiff's discharge may raise an inference of pretext); *Fox v. Certainteed Corp.*, 198 F.3d 245 (6th Cir. 1999) (same as *Chichewicz*).

Defendants attempt to justify their shifting explanation by citing the testimony of Machan.  Specifically, Machan testified that he received the assessment scores that showed Plaintiff did not finish first on the sergeant's examination, but he never tallied the total scores for the 2008 sergeant's examination.  (Doc. 23 at 281-82).  Defendants contend that they did not become aware that Plaintiff had finished first on the sergeant's examination until this litigation, at which time they conceded he would have finished first, but claimed that he still would not have been hired due to budgetary issues.  (Doc. 41 at 1581).  Nevertheless, Plaintiff has succeeded in setting forth evidence that pokes holes in Defendants' explanation.

30

First, the evidence presented by Plaintiff presents raises material factual questions relating to Machan's knowledge as to whether Plaintiff finished first on the sergeant's examination. Machan received an email with the Final Report on the sergeant's examination on or about December 4, 2008 (Doc. 40-1 at 1548), but told the candidates on December 22, 2008 that he had not received the final report and once he did he would "add the pre-assessment points" and keep them updated the best he could (Doc. 40-2 at 1558).  Machan consistently told Plaintiff he would post the results as soon as he received them.  (Doc. 24 at 389).  Another Final Report was received in January 2009.  (Doc. 40-2 at 1562, 1570; Doc. 24 at 394).  However, Plaintiff was not given a copy of the results until October 28, 2009, which did not include any points or credits for his service as a veteran.  (Doc. 24 at 392-94).  Construing the evidence in favor of Plaintiff, it shows that Machan promised to provide the results, and include the pre-assessment points, as soon as he received the results, but did not do so.  Instead, Machan was less than forthcoming with the results, and did not provide them to Plaintiff until almost one year after he initially received them.  The reasons for his delay have not been explained.  As such, there are genuine questions as to whether Machan knew or suspected that Plaintiff would have finished first if the points were tallied prior to this litigation and therefore chose not to officially tally those points.  This evidence also casts doubt on Defendants' justification for its shifting explanations.

Second, Plaintiff has set forth evidence that casts doubt on Defendants' secondary explanation that the City of Milford left the sergeant's position vacant because of budgetary issues. The evidence in support of Defendants' explanation shows that the City had a budgetary shortfall in 2008, had concerns about the budget

going into to 2009, and had a projected shortfall for 2009.  (Doc. 22-2 at 187-212; Doc. 22-3 at 187-212; Doc. 27 at 637).  However, there also is evidence that the sergeant's examination was given in 2008 without any mention of budgetary issues (Doc. 25 at 451-52), that the only written documentation specifically showing that the police department decided not to fill the sergeant's position because of economic issues was a note written in 2011 after this lawsuit had been filed (*see* Doc. 26 at 517), and that the final decision not to promote a sergeant occurred at least three months after the sergeant's examination and after the results had been returned for the sergeant examination on which Plaintiff scored the highest when his preference points were included (Doc. 22-3 at 187-212; Doc. 40-2 at 1571).  Moreover, there is evidence that Defendants have not promoted anyone over the age of 40 to sergeant since 2003.  (Doc. 40-2 at 1575).  Defendants have not disputed that point.  (*See generally* Doc. 41).  As such, Plaintiff has met his burden of demonstrating pretext at this stage of the ligation as to the failure to promote him to sergeant.

### *Involuntary Medical Leave*

The Court now turns to whether Plaintiff has met his burden of proving pretext at this stage as to being placed involuntarily on medical leave.  Given that there is a written letter from Dr. Ortega that was unsolicited by Defendants that indicates that Plaintiff "had not regained the strength of the knee and has fallen in [sic] his face because of it," which letter does not reference when that incident occurred (Doc. 37-1 at 1238), Defendants' explanation for placing Plaintiff on medical leave has a basis in fact.  Plaintiff instead attempts to discredit the explanation of Defendants by claiming that the statement by Dr. Ortega referred to Plaintiff's 2004 medical history rather than his

present history, that an independent doctor stated Plaintiff was eligible for full duty, and that his treatment was in contrast to the treatment given to Officer Bogan.  However, none of those arguments create a genuine issue of material fact as to whether the given explanation was pretextual.

Here, the statement made by Dr. Ortega in the letter upon which Machan relied does not indicate that the statement about not regaining strength or about falling on his face relates to an incident in 2004.  (Doc. 37-2 at 1238).  Rather, the letter is at best vague as to when the incident occurred.  There is no evidence that suggests that Machan should have known the statement referred to an incident from 2004, and to the extent Plaintiff speculates that he should have known such speculation is insufficient to stave off summary judgment.  Moreover, there is no evidence before the Court that suggests that such a statement from a doctor alone would not motivate Defendants to place Plaintiff on medical leave.  Although Plaintiff attempts to compare himself with Officer Bogan, that comparison is unavailing.  There is no evidence that Defendants ever received any information after Officer Bogan returned to work indicating that Officer Bogan had a physical problem post-surgery that affected his ability to perform his duties.  In contrast, Defendants had the letter from Dr. Ortega.  (Doc. 37-1 at 1238).  Moreover, when Officer Bogan was known to have a medical issue, he, like Plaintiff, was placed off duty for a period of time.  (Doc. 23 at 313-14).  As such, Plaintiff has not set forth any evidence that would demonstrate that a similarly situated employee in a non-protected class was treated more favorably.  As to the evidence that Plaintiff eventually was released to "full duty" by another doctor, it does not show that the doctor's original letter was insufficient to motivate the action taken or that the real

reason for its action was discrimination.  Even if the decision to place Plaintiff on medical leave was not optimal or left stones unturned, the Court cannot say that the evidence shows the employer lacked an honest belief in its explanation of its behavior. Accordingly, summary judgment is granted to Defendants as to Plaintiff's retaliation claim based upon the adverse action of being placed on medical leave in 2009.

*Fitness for Duty Evaluations*

Finally, the Court considers the issue of pretext with respect to Plaintiff being able to return to work following medical leave.  As explained above with respect to Plaintiff's disparate treatment claim, Defendants have not addressed whether they have a legitimate, non-discriminatory reason for why Plaintiff was purportedly required to undergo multiple fitness evaluations while Officer Bogan was not subject to such requirements.  Absent such a legitimate, non-discriminatory reason for its actions, the Court cannot find that summary judgment is appropriate. Moreover, the evidence put forth by Plaintiff suggests, when construed in the light most favorable to him, that the circumstances were insufficient to warrant the adverse action.  *See Smith*, 220 F.3d at 762 (plaintiff can prove pretext under the third *Manzer* prong by demonstrating that he was treated differently than similarly situated employees).  Officer Bogan was under 40 years of age, and served in the same or similar role as Plaintiff.  (Doc. 23 at 313-14). There is no evidence presented to the Court that Officer Bogan was subject to different policies or procedures than Plaintiff with respect to medical issues experienced while employed by the City of Milford's Police Department.  To return from medical leave, Officer Bogan did not go through the same procedures as Plaintiff.  (Doc. 23 at 313-14) (Q:  And [Officer Bogan] came back to work?  A:  Correct.  Q:  Did he go through the

34

same paces that Ralph went through?  A:  No.  Q: He didn't?  A: No.").  Instead, Machan called the Sheriff's Office and obtained verbal confirmation that Officer Bogan had been cleared to return to work as a corrections officer by the doctor for the Sheriff's Office.  (Doc. 23 at 313-15).  Officer Bogan was not required to obtain clearance from Dr. Randolph, the doctor for the City of Milford's Police Department.  (Doc. 23 at 315).  Plaintiff, however, visited three doctors before he was permitted to return to work at the City of Milford's Police Department.  (*See* Doc. 37-1 at 1241-43; Doc. 40-2 at 1575-76).  Therefore, when the evidence is viewed in the light most favorable to Plaintiff, it suggests that a younger officer was given more favorable treatment than Plaintiff as to the issue of medical clearances.  Plaintiff therefore has met his burden on this issue and summary judgment is not appropriate.

*Summary*

In sum, the Court concludes that summary judgment as to Plaintiff's claim for retaliation relating to the issues of failure to promote and to the fitness for duty evaluations is not warranted, and the case will proceed on both issues.

**C.**   **Civil Rights**

In Count Four of his Complaint, Plaintiff alleges that Defendant Machan infringed upon his First Amendment right of Free Speech and his Fourteenth Amendment rights under the Equal Protection Clause (Doc. 1 at 6-7).  Defendants move for summary judgment only on the First Amendment issue (*see* Doc. 22 at 83-85) on the basis that Plaintiff has failed to demonstrate he spoke on a matter of public concern.  Defendants do not move for summary judgment on the Equal Protection Clause claim under the

Fourteenth Amendment, and thus, that portion of the claim remains pending and will not be addressed here.

To determine whether a public employee's speech is entitled to constitutional protection, the Court applies a two-part inquiry. *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995) (noting that the Supreme Court has established a "two step analysis for determining when the discharge of a public employee violates the First Amendment").  First, the plaintiff must establish that his speech was related to a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) (explaining that determining whether an employee's speech pertains to a matter of public concern is the threshold question in evaluating a plaintiff's First Amendment retaliation claim).  The second stage of the inquiry, which occurs only if the speech in question involved a matter of public concern, requires balancing the plaintiff's free-speech interests against the government's interests as an employer. *Id.* at 146, 149-54 (explaining that if a plaintiff's speech does not pertain to a matter of public concern, "it is unnecessary for us to scrutinize the reasons for her discharge"); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968) ("The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

In *Connick,* the Supreme Court explained that speech touches upon matters of public concern where it can "be fairly considered as relating to any matter of political, social, or other concern to the community . . . ." *Connick*, 461 U.S. at 146. "Whether an

employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48 (footnote omitted). These considerations differentiate between an employee's speech that touches upon matters of public concern and speech that is of particular interest only to the speaker. *Id.* at 147. The latter, unlike the former, cannot form the basis of a First Amendment retaliation lawsuit. *Id.* at 147 ("We . . . hold that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."); *see also Farmer v. Cleveland Pub. Power,* 295 F.3d 593, 600 (6th Cir. 2002).

Here, Plaintiff contends that his First Amendment rights were violated in regards to him "constantly question[ing] why the results of the sergeant's test/evaluation/selection were not made or posted" and "question[ing] the failure of the city and Chief Machan to fill the sergeant's position." (Doc. 40 at 1519). Plaintiff, however, cites to no specific evidence in support that would explain what the "questioning" to which he refers entailed, and it is the Plaintiff's duty to designate those portions of the record with enough specificity that the Court can readily identify those facts upon which Plaintiff intends to rely. *Karnes v. Runyon*, 912 F. Supp. 280, 283 (S.D. Ohio 1995). The Court does not have a duty to search the entire record to establish that there is a material issue of fact. *Id.; see also InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). As

such, the Court will rely upon only the above arguments advanced by Plaintiff to determine if there is a genuine issue of material fact.

The threshold issue is whether Plaintiff's speech addressed a matter of public concern, which is a matter for the Court to decide. *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006); *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2003). In this case, the content, form and context of Plaintiff's speech demonstrate that the speech was not a matter of public concern. The content of the speech was the failure to post the results of the sergeant's examination that Plaintiff had taken, and the failure of the City of Milford and Chief Machan to fill the sergeant's position. (*See* Doc. 40, at 1519). However, since Plaintiff has failed to provide any explanation or specifically cite to the evidence which he believes constitutes the protected speech, the Court has no basis for determining more precisely what was said. Based on Plaintiff's argument and the facts presented to the Court in the briefings, however, the point of the speech was to remedy his personal grievances relating to his application for an employment promotion to the sergeant's position, even if the speech tangentially and incidentally raised matters that could be of public concern. *See Farhat v. Jopke*, 370 F.3d 580, 592-93 (6th Cir. 2004) (stating that whether speech is of public concern depends on the "'focus'" or "'point'" of the speech in question and not on what might be "'incidentally conveyed'" by the speech, as "'passing'" or "'fleeting'" references to an "arguably public matter do not elevate the speech to a matter of 'public concern' where the 'focus' or 'point' of the speech advances only a private interest").

The form of the specific speech at issue is unclear as Plaintiff simply complains that he "constantly question[ed]" why the results were not made or posted, and

"questioned the failure of the city and Chief Machan to fill to sergeant's position."  (Doc. 40, p. 12).  There is no indication, however, that Plaintiff questioned these issues in a public forum, such as through the media or a public complaint.  Rather, from the evidence before the Court, it appears that Plaintiff raised those questions in private conversations or private internal correspondence with Defendants or those associated therewith.

Moreover, the context in which Plaintiff raised those questions was in relation to his personal grievances about not receiving the results of the sergeant's test that he took in November 2008 and not receiving the promotion to sergeant.  His motivation in speaking, although not dispositive, was to obtain the results of the test and to obtain an employment promotion.  Thus, he was speaking as an employee and not as a public citizen.

Considering the above along with the lack of evidence and argument presented by Plaintiff as to how his speech constituted a matter of public concern, the Court finds that Plaintiff has failed to demonstrate a genuine issue of material fact as to whether the issue is one of public concern.  As the matter is not one of public concern, the Court need not consider the second prong of the analysis.  Summary judgment is granted to Defendants on Count Four of Plaintiff's Complaint (Doc. 1) as it relates to violation of the First Amendment.  However, the Court again notes that Count Four remains pending as to the claim for violation of the Equal Protection Clause as Defendants did not move for summary judgment on that specific issue.

D.    **Breach of Contract**

Plaintiff asserts a claim for breach of contract in Count Five of the Complaint (Doc. 1 at 7-8). However, the only evidence before this Court as to a contract between Plaintiff and Defendants is evidence of the CBA. (Doc. 22-1 at 107; Doc. 24 at 348). The CBA provided for a grievance procedure of binding arbitration that was intended to handle any "breach, misinterpretation, or improper application" of the CBA. (Doc. 22-1 at 107).

Where a collective bargaining agreement provides for binding arbitration of grievances relating to "wage, hours, and the terms and conditions" of employment, binding arbitration is the exclusive remedy for "violations of employee's employment rights arising from the collective bargaining agreement." *See Brannen v. Bd. of Educ.*, 761 N.E.2d 84, 90 (Ohio App. 2001). There is no argument or evidence presented that shows Plaintiff followed that grievance procedure with respect to any claimed breach of the CBA by Defendants. (*See generally* Doc. 40). Rather, Plaintiff argues that the contract cannot deprive him of his remedy or supplant the remedies contained under federal law for age and veteran's discrimination. (Doc. 40 at 1519). However, Defendants do not dispute that Plaintiff is may maintain his federal law claims for age and veteran's discrimination, but instead contend Plaintiff has not demonstrated he is entitled to relief for breach of contract. (Doc. 22 at 87-88; Doc. 41at 1518).

As Plaintiff has set forth no argument or evidence that demonstrates he would be entitled to pursue his claim for breach of contract in this Court (*see* Doc. 40 at 1519), the Court holds that summary judgment in favor of Defendants on Plaintiff's breach of contract claim in Count Five of the Complaint is appropriate.

### E. <u>Tortious Interference with Contract</u>

In Count Six of the Complaint, Plaintiff asserts a claim for tortious interference with contract on the basis that Machan tortiously and intentionally interfered with Plaintiff's contract to provide police services to the City of Milford.   (Doc. 1 at 8). Defendants moved for summary judgment on that claim on the basis that Plaintiff has not demonstrated that Machan can be liable for tortious interference with contract because the act complained of occurred within the scope of Machan's duties, and that is not the type of situation that tortious interference is designed to protect.   (Doc. 22). Plaintiff made no argument, and set forth no contrary evidence or law, on this issue in his opposition to Defendants' motion for summary judgment.  (*See generally* Doc. 40).

The basic principle underlying a claim of tortious interference is that when someone acting without privilege, induces or purposely causes a third party to terminate a business relationship with another, then that person should be held liable for the harm resulting from the terminated relationship.   *Wolf v. McCullough-Hyde Mem. Hosp., Inc.*, 586 N.E.2d 1204, 1208 (1990) (citing *Juhasz v. Quik Shops*, *Inc.*, 379 N.E.2d 235, 238 (Ohio App. 1977)).   The elements of a claim for tortious interference of a contractual or business relationship include (1) the existence of a contractual or business relationship; (2) knowledge of the relationship by the tortfeasor; (3) an intentional and improper act by the tortfeasor terminating a business relationship; (4) lack of privilege on the part of the tortfeasor; and (5) resulting damages.   *Clark v. Christ Hosp.*, No. C-060342, 2007 Ohio App. LEXIS 3864, at *10 (Ohio App. Aug. 24, 2007) (citing *Brookside Ambulance, Inc. v. Walker Ambulance Serv.*, 678 N.E.2d 248 (Ohio App. 1996)).   The proponent of a claim for tortious interference has the burden under Ohio law to establish lack of a privilege or improper interference by the alleged tortfeasor.   *Kenty v. Transamerica*

*Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995). Thus, only where the tortfeasor acts maliciously may the person injured by the tortfeasor's conduct recover damages. *Clark*, 2007 Ohio App. LEXIS 3864, at *10 (citing *Tripp v. Beverly Enterprises-Ohio, Inc.*, No. 21506, 2003 Ohio App. LEXIS 6158, at 27-28 (Ohio App. Dec. 17, 2003). In *Anderson v. Minter*, 291 N.E.2d 457, 461 (Ohio 1972), the Ohio Supreme Court held that a plaintiff could not bring an action for tortious interference against her former supervisor because an action did not exist when the act complained of was within the defendant's duties. But the court noted that an action may be maintained against an "outsider" to an employment relationship. *Id.*; *see also Dryden v. Cincinnati Bell Tel. Co.*, 734 N.E.2d 409, 414 (Ohio App. 1999) (quoting *Wilson v. Procter & Gamble Co.*, No. C-970778, 1998 Ohio App. LEXIS 5290 (Ohio App. Nov. 6, 1998)). .

As the evidence shows that Machan, as the Chief of the City of Milford's Police Department, was acting as Plaintiff's supervisor for the City of Milford's Police Department at the time he made or failed to make the decisions that allegedly interfered with Plaintiff's employment with the City of Milford's Police Department, and since Plaintiff has not set forth either evidence or argument in opposition, the Court concludes that Machan cannot be held liable for tortious interference with Plaintiff's employment contract. Accordingly, summary judgment is granted in favor of Defendants on Plaintiff's claim for tortious interference with contract in Count Six of the Complaint.

### F. Violation of the Ohio Constitution

In Count Seven of the Complaint, Plaintiff asserts a claim for violation of his inalienable rights guaranteed by Article I, Section I of the Ohio Constitution. (Doc. 1 at 8-9). Defendants move for summary judgment on this claim on the basis that no

evidence was presented by Plaintiff as to how those inalienable rights were infringed upon, or even which right Plaintiff believed was infringed upon by Defendants.  (Doc. 22 at 89).  In his opposition, Plaintiff sets forth no argument or evidence relating to this claim.  (*See generally* Doc. 40).  Accordingly, the Court finds that there are no genuine issues of material fact as to this claim and grants summary judgment in favor of Defendants on Count Seven of the Complaint.

### G.    <u>Veteran Discrimination and Retaliation</u>

In Counts Eight and Nine of his Complaint (as included by amendment in Doc. 10), Plaintiff asserts claims for discrimination and retaliation against a veteran under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4311.  The USERRA provides, in pertinent part:

 (a) A person who . . . has performed . . .  in a uniformed service shall not be denied . . . promotion, or any benefit of employment by an employer on the basis of that . . . performance of service . . . .

 (b) An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter [38 USCS §§ 4301 et seq.], (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter [38 USCS §§ 4301 et seq.], or (4) has exercised a right provided for in this chapter [38 USCS §§ 4301 et seq.]. . . .

 (c) An employer shall be considered to have engaged in actions prohibited--

  (1) under subsection (a), if the person's . . . service . . . in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of . . .service . . .; or

  (2) under subsection (b), if the person's (A) action to enforce a protection afforded any person under this chapter [38 USCS §§ 4301 et seq.], (B) testimony or making of a statement in or in connection

> with any proceeding under this chapter [38 USCS §§ 4301 et seq.], (C) assistance or other participation in an investigation under this chapter [38 USCS §§ 4301 et seq.], or (D) exercise of a right provided for in this chapter [38 USCS §§ 4301 et seq.], is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action, testimony, statement, assistance, participation, or exercise of a right.

38 U.S.C. § 4311(a)-(c).  The USERRA "is very similar to Title VII, which prohibits employment discrimination 'because of . . . . race, color, religion, sex or national origin" and states that such discrimination is established when one of those factors 'was a motivating factor for any employment practice, even though other facts also motivated the practice.'"  *Staub v. Proctor Hosp.*, _ U.S. _, 31 S. Ct. 1186, 1191, 179 L. Ed. 2d 144 (2011) (citing 42 U.S.C. § 2000e-2(a), (m)).

When bringing a USERRA claim, the employee has the "initial burden of establishing a prima facie case of discrimination."  *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 518 (6th Cir. 2009) (quoting *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001)).  Prima facie uniformed service discrimination can be proven through direct or circumstantial evidence that "the defendant relied on, took into account, considered or conditioned its decision" on an employee's military status.  *Petty v. Metro. Gov't of Nashville-Davidson Cnty.*, 538 F.3d 431, 446 (6th Cir. 2008) (quoting *Coffman v. Chugach Support Servs.*, 411 F.3d 1231, 1238 (11th Cir. 2005)).  Circumstantial evidence of a discriminatory motivation may include the "proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the employer's conduct and the proffered reason for its actions, the employer's expressed hostility toward military members together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other

44

employees with similar work records or offenses." *Bobo v. UPS*, 665 F.3d 741, 754 (6th Cir. 2012).  If the plaintiff carries the initial burden to show by a preponderance that his protected status was a motivating factor in his discharge from employment, then the burden shifts to the defendant to prove affirmatively that it would have taken the same employment action in the absence of the plaintiff's protected status.  *Id.* (citing *Hance*, 571 F.3d at 518; *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001)); *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1026 (6th Cir. 2010).

Here, Plaintiff has met his burden at this stage of the litigation as to his claims for discrimination and retaliation based on his veteran status.  It is not disputed that Plaintiff was a veteran, that Plaintiff was entitled to a veteran's preference in the scoring of the sergeant's examination in 2008, or that Plaintiff finished first on the sergeant's examination once his veteran's preference was included in his score.   Rather, Defendants move for summary judgment apparently on two bases: (1) that veteran discrimination could not have been a motivating factor in the failure to promote Plaintiff because Machan did not know Plaintiff finished first on the sergeant's examination, and (2) that it could not have been a motivating factor, and that Defendants would have taken the same action despite Plaintiff's veteran status, because Defendants faced legitimate budgetary shortfall that prevented it from hiring a new sergeant. Nevertheless, as explained with respect to Plaintiff's age discrimination and retaliation claims, there are genuine issues of material fact on both issues.

First, there are inconsistencies with respect to Machan's conduct and the proffered explanation that he was unaware of who finished first on the sergeant's examination. The testimony of Machan indicates that he received the assessment

scores that showed Plaintiff did not finish first on the sergeant's examination, but that he never tallied the total scores for the 2008 sergeant's examination. (Doc. 23 at 281-82). Defendants contend they initially learned that Plaintiff would have finished first during the course of litigation. (Doc. 41 at 1581). However, there also is evidence that (a) Machan had received the Final Report on the sergeant's examination on or about December 4, 2008 (Doc. 40-1 at 1548), (b) that on December 22, 2008, Machan told Plaintiff that he did not have the final report and that once he received it he would "add the pre-assessment points" and "keep [Plaintiff] updated the best" that Machan could (Doc. 40-2 at 1558), (c) that Plaintiff was consistently told by Machan that the results would be posted as soon as Machan received them (Doc. 24 at 389), which he did not do, and (d) that Plaintiff did not see a copy of the report until October 2009 and that report still did not contain an points or credits for his veteran service (Doc. 24 at 392-95). Moreover, there is no evidence presented that indicates Machan was unaware of Plaintiff's veteran status or that he was entitled to a veteran preference in the scoring of the examination. (*See generally* Docs. 20, 41). Construing the evidence in favor of Plaintiff, it shows that Machan promised to provide the results, and include the pre-assessment points, as soon as he received the results, but did not do so. Instead, Machan was less than forthcoming with the results, and did not provide them to Plaintiff until almost one year after he initially received them at which time he still had not credited Plaintiff with his points for service as a veteran. As such, there are genuine questions as to whether Machan knew or suspected that Plaintiff would have finished first if the veteran's preference points and other points were tallied prior to this litigation

and whether his reasons were for not officially tallying those points were discriminatory or retaliatory.

Second, there also are inconsistencies between Defendants' conduct and its proffered explanation that Plaintiff would not have been promoted because of a budgetary crisis.  As explained above with respect to retaliation based on age, the evidence in support of Defendants' explanation shows that the City had a budgetary shortfall in 2008, had concerns about the budget going into to 2009, and had a projected shortfall for 2009.  (Doc. 22-2 at 187-212; Doc. 22-3 at 187-212; Doc. 27 at 637).  However, there also is evidence that the sergeant's examination was given in 2008 without any mention of budgetary issues (Doc. 25 at 451-52), that the only written documentation specifically showing that the police department decided not to fill the sergeant's position because of economic issues was a note written in 2011 after this lawsuit had been filed (see Doc. 26 at 517), and that the final decision not to promote a sergeant occurred at least four months after the sergeant's examination and after the results had been returned for the sergeant exam on which Plaintiff scored the highest when his veteran's preference points were included (Doc. 22-3 at 187-212; Doc. 40-2 at 1571).  Based on this evidence, the Court also is not persuaded at this stage of the litigation that there are no genuine issues of material fact as to whether Defendants would have taken the same employment action in the absence of the plaintiff's protected status.

Construing all of the facts in favor of Plaintiff, the Court finds that summary judgment is not appropriate on Plaintiff's claims for discrimination and retaliation based on his veteran status, as set forth in Counts Eight and Nine.

## II.    **CONCLUSION**

Based on the foregoing, Defendants' Motion for Summary Judgment (Doc. 20) is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, it is **ORDERED** that:

1. As to Plaintiff's claims for age discrimination in Counts One and Two, summary judgment is **DENIED** to Defendants with respect to the issue of Plaintiff having to undergo multiple fitness for duty evaluations prior to returning to work, and **GRANTED** to Defendants on all remaining claims for age discrimination brought under Counts One and Two.

2. As to Plaintiff's claims for retaliation in Count Three, summary judgment is **DENIED** to Defendants with respect to the failure to promote Plaintiff and the issue of Plaintiff having to undergo multiple fitness for duty evaluations prior to returning to work, and **GRANTED** to Defendants on all remaining retaliation claims brought under Count Three.

3. As to Plaintiff's claims for violation of his civil rights under 42 U.S.C. § 1983 in Count Four, summary judgment is **DENIED** to Defendants on Plaintiff's claim for violation of the Fourteenth Amendment's Equal Protection Clause, and **GRANTED** to Defendants on Plaintiff's claim for violation of the First Amendment.

4. As to Plaintiff's claim for breach of contract in Count Five, summary judgment is **GRANTED** to Defendants.

5. As to Plaintiff's claim for tortious interference in Count Six, summary judgment is **GRANTED** to Defendants.

6. As to Plaintiff's claim for violation of the Ohio Constitution in Count Seven, summary judgment is **GRANTED** to Defendants.

7. As to Plaintiff's claims for discrimination and retaliation based on his veteran status in Counts Eight and Nine, summary judgment is **DENIED** to Defendants.

**IT IS SO ORDERED.**

s/ Michael R. Barrett
Michael R. Barrett, Judge
United States District Court